IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**DWAYNE STARLING**,

           *Plaintiff*,

v.

**GENERAL MOTORS, LLC,**

           *Defendant*.

Cause No. 3:21-CV-750-CWR-LGI

## ORDER

Before the Court are the Defendant's motion for summary judgment and the Plaintiff's motion *in limine*. Docket Nos. 40 and 55. Upon review, the motions will be granted in part and denied in part.

**I.  Factual and Procedural History**

In 2008, Dwayne Starling started working at a General Motors warehouse in Brandon, Mississippi. He was a frontline operations supervisor responsible for approximately 65 to 70 employees. He is a Black man.

In 2016, Starling started reporting to William Nelson. Nelson is also a Black man.

Starling alleges that Nelson engaged in discriminatory behavior. Nelson reportedly recommended only white employees for pay raises and rarely disciplined white employees for tardiness and unexcused absences. Starling complained that Nelson treated him

differently than a white coworker, but GM allegedly failed to address his concerns, instead opting to fire him.[1]

The events of January 16, 2021 are at the heart of the dispute. That day, Starling and Brad McNair, another frontline operations supervisor, discussed over the radio that Starling's team would process some "carload" items. Neither of them had caused the backlog of carload items—a prior shift had—but Starling's team had the manpower to take them on.

Nelson heard about the carload items and was not pleased. He wanted Starling's crew to work on something else. He came to Starling's department to talk about it.

This is where the parties' disagreements begin to accumulate. Starling claims that as he remained calm, Nelson became "very argumentative." Docket No. 40-1 at 44. The two moved to Nelson's office. And there, Starling says he started complaining that Nelson always let McNair—who is white—"get away with everything." *Id.* at 48. Here's how Starling explained this dynamic at his deposition:

> Because Brad was -- there were different treatment based on how William approached Brad versus how he approached me.
> Okay. First of all, Brad, he's a white gentleman. He was my peer, and we had been working together a long time.
> To go ahead and give you a little history, you know, of what went on, Brad would say, "Man, I know you get tired of dealing with that guy." And these are words exactly out of Brad's mouth.
> But I could not do anything right. I was real good at my job. I knew my job responsibilities. When Brad was at work, I couldn't do anything right. When Brad was absent from work, when he decided that he wanted to take off, he'd tell William, "I'm gone for the day." Nothing would happen.
> He will call in -- even if he called in, wouldn't even come to work, no discipline, nothing. Just over extended period of time nothing happened to him.

---

[1] Starling allegedly notified plant managers Aaron Slater and Randall House and human resource employees Barbara Jones and Michael Grills of Nelson's misconduct. Docket No. 38 at 3.

2

> But to me, when Brad was out, I was the best thing in the world. I did everything right. You know, I was praised for this. But when Brad was there, I couldn't do anything right.
> . . .
> I did convey that to William about it was different from how he treated Brad versus how he treated me and why am I going home and nobody else is going home since the whole entire shift was mandatory. So that was not fair.

*Id.* at 48-49. Starling also testified that McNair received raises, but Starling "got nothing." *Id.* at 64-65.

We return to the January 16 conversation. Starling characterized his efforts to complain about McNair's preferential treatment as "a normal conversation." *Id.* at 46. Even so, the conversation became more intense. At one point, Starling told Nelson, "You're testing your Christianity now." *Id.* at 50. A fed-up Nelson then accused Starling of being "hysterical." *Id.* at 45. He turned his back on Starling and dismissed him for the day. *Id.*

GM has presented a different version of the exchange. In its account, Starling raised his voice, "yelling" at and berating Nelson. It says other employees confirmed the yelling. In Nelson's words, Starling accused him of having "2 sets of rules and how I continue to ride him and how I didn't acknowledge any of the things that he had done well and how I continued to let the white boy get away with anything and everything." Docket No. 40-3 at 9. There was more. Starling asked Nelson how he could sleep at night considering how Nelson treated him. "He told me that I was one of those black guys that got a little bit of power and turned around to make things harder for other black guys while I let the white boys just get with everything get away with murder." *Id.* Nelson says Starling was "hostile, hysterical and irrational." *Id.* at 10. Nelson acknowledges that he did, however, turn his back on Starling. *Id.*

3

Nelson sent Starling home, but not McNair. It would be Starling's last day at the warehouse.

GM launched an internal investigation on January 18. In an interview conducted during that investigation, Nelson said Starling hadn't complained about race discrimination, but said Starling was "hostile and irate" that day, and claimed that Starling's "racial comments . . . made him uncomfortable." *Id.* at 17. Nelson felt "threatened" to the point where he thought he had to defend himself, although he conceded that Starling did not directly threaten him. *Id.* Nelson explained that he sent Starling home because of his "behavior, yelling[,] and creating a hostile work environment." *Id.* at 16.

Also on January 18, Starling filed an internal complaint using GM's Awareline system. He said "Nelson treat[ed] me differently from my peers" and never addressed others' "behavior issues." Docket No. 40-1 at 139. Starling felt "discriminated and retaliated against, harassed, and . . . placed in a 'hostile work-environment' around [Nelson]." *Id.*

GM's internal investigator interviewed Starling the next day. Starling did not use the word "race" in that interview, but says he made it plain that he was accusing Nelson of race discrimination.

GM then terminated Starling. It characterized Starling's actions as misconduct, stating that he "fail[ed] to act with integrity." Docket No. 40-3 at 7. His official termination date was March 3. Starling had an otherwise unblemished disciplinary record.

An EEOC administrative charge of discrimination followed, which in turn led to this lawsuit.

Starling claims that his termination constituted racial discrimination in violation of Title VII and 42 U.S.C. § 1981, age discrimination in violation of the Age Discrimination in

4

Employment Act (ADEA), and retaliation in violation of all three of those statutes. For the ADEA claim(s), Starling says he was replaced by his supervisor's son, Justin Nelson, "who came straight out of college." Docket No. 43-3 at 2.

## II.     Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403 (5th Cir. 1999). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009).

"To defeat summary judgment, the non-movant is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). It is not the district court's "[d]uty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Id*. The district court must "[v]iew the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001).

## III.    Discussion

### A.    Exhaustion

GM first contends that Starling failed to exhaust his administrative remedies for race discrimination under Title VII. The "race" box in his EEOC Charge was not checked. Starling responds that his discussion of race discrimination in his EEOC intake questionnaire, which

5

preceded the EEOC's sending of a Charge, was sufficient to exhaust the claim. Starling says the EEOC made a clerical error when it checked only the "age" and "retaliation" boxes.

A Title VII plaintiff must first file an administrative charge with the EEOC before commencing suit in federal court. *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109, 113 (2002). But the Fifth Circuit has long rejected the notion that a "failure to place a check mark in the correct box is a fatal error." *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 463 (5th Cir. 1970).

Instead, "[i]n determining whether a plaintiff has exhausted a particular claim, we have noted that the scope of an EEOC complaint should be construed liberally." *Patton v. Jacobs Eng'g Grp., Inc.*, 874 F.3d 437, 443 (5th Cir. 2017) (quotation marks and citation omitted). "[T]his court interprets what is properly embraced in review of a Title VII claim somewhat broadly, not solely by the scope of the administrative charge itself, but by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Id.* (quotation marks and citation omitted).

In addition, "a claim need not always arise from the EEOC charge *form*. In some circumstances, other documents can serve as a charge." *Ernst v. Methodist Hosp. Sys*, 1 F.4th 333, 337 (5th Cir. 2021). In 2008, for example, the Supreme Court "determined that a sufficiently detailed and verified intake questionnaire sufficed as a charge under the Age Discrimination in Employment Act." *Id.* (citing *Fed. Exp. Corp. v. Holowecki*, 552 U.S. 389, 405-07 (2008)). Under that precedent, the Fifth Circuit has previously found that a plaintiff exhausted their administrative remedies if the intake questionnaire was considered "*part* of the formal charge." *Patton*, 874 F.3d at 443.

6

*Patton* controls our situation. The record shows that Starling shared with EEOC staff his allegations of race-based differential discipline, benefits, and pay in an interview conducted before he signed the Charge. Docket No. 43-3 at 2-13. Why the EEOC neglected to check the race box is unknown. (Also unknown is how the EEOC concluded that Starling's claim should be terminated within mere hours of receiving his signed charge.) Considering the interview as a part of the formal charge, however, makes plain that the scope of the EEOC's investigation would reasonably be expected to encompass racial discrimination. The Court will proceed to the merits.

**B.   Retaliation**

"Title VII makes it unlawful for an employer to retaliate against an employee who opposes an employment practice that violates Title VII." *Davis v. Fort Bend Cnty.*, 765 F.3d 480, 489 (5th Cir. 2014) (citation omitted).

To establish a prima facie case of retaliation, "a plaintiff must show that (1) he engaged in conduct protected by Title VII; (2) he suffered a materially adverse action; and (3) a causal connection exists between the protected activity and the adverse action." *Hudson v. Lincare, Inc.*, 58 F.4th 222, 231 (5th Cir. 2023) (quotation marks and citations omitted). In retaliation cases that rely solely on circumstantial evidence, the Court applies the familiar *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under that framework,

> If the plaintiff establishes a prima facie case, then the employer has the burden of production to provide a legitimate, non-discriminatory reason for the adverse employment action. If the employer meets this burden, then the plaintiff has the burden to prove that the proffered reason is pretextual. A plaintiff may establish pretext by showing that a discriminatory motive more likely motivated her employer's decision, such as through evidence of

disparate treatment, or that her employer's explanation is unworthy of credence.

*Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 577 (5th Cir. 2020), *as revised* (Aug. 14, 2020) (quotation marks and citations omitted).[2]

General Motors initially argues that Starling cannot establish the first element of his prima facie case—engagement in protected activity. "Protected activity is defined as opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII." *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003) (quotation marks and citation omitted).

GM's arguments are well-taken as to Starling's retaliation claim predicated upon an age discrimination complaint. The Court does not see that Starling engaged in any protected activity as to age discrimination. The motion is granted as to this theory of liability.

GM's remaining arguments fail to persuade. It characterizes Starling's January 16 grievance as "an attack on William Nelson in which he accused him of not being a Christian, and of letting power go to his head," in which race was tangential. Docket No. 41 at 16. But the evidence viewed in the light favorable to the non-movant shows that Starling squarely made several complaints about race-based differential treatment. Nelson even acknowledged in his HR interview that he was "uncomfortable" in part because Starling accused him of racial discrimination. Docket No. 40-3 at 17. That was protected activity. *See Wallace v. Performance Contractors, Inc.*, 57 F.4th 209, 225 (5th Cir. 2023) (finding that "complaining to

---

[2] The Court leaves for further briefing whether the jury should be instructed on a "direct evidence" theory on any claim on this case. *See Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 993 (5th Cir. 2005).

8

her supervisors about not being afforded opportunities based on her sex" was "protected activity," despite employer's argument that complaints were "general gripes"). Starling then engaged in protected activity two days later, when he filed an internal complaint to GM containing the same allegations. *See Fierros v. Tex. Dep't of Health*, 274 F.3d 187, 194 (5th Cir. 2001) (recognizing that use of an internal process to file an employment discrimination complaint is protected activity); *Fisher v. Lufkin Indus., Inc.*, 847 F.3d 752, 755 (5th Cir. 2017), *as revised* (Mar. 30, 2017) (same). The analysis must move on to step two.

The parties do not dispute that General Motors has satisfied its burden of production at this step. It articulates that it terminated Starling for a legitimate, non-discriminatory reason: an "aggressive outburst" toward Nelson. Docket No. 41 at 9. As a result, we move on to step three, pretext.

"A plaintiff may establish pretext either through evidence of disparate treatment [of a similarly-situated employee] or by showing that the employer's proffered explanation is false or unworthy of credence." *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (citation omitted). "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence that the employer did not act for the asserted non-discriminatory reasons." *Stennett v. Tupelo Pub. Sch. Dist.*, 619 F. App'x 310, 317 (5th Cir. 2015) (quotation marks and citation omitted).

There plainly is a factual dispute on this element. Starling testified at his deposition that his conversation with Nelson was "normal." Docket No. 40-1 at 46. He several times denied raising his voice. *Id.* at 44 and 46. It is also worth noting that in his verified charge of discrimination with the EEOC, Starling asserts that he left "peacefully," and that it was

9

Nelson who was argumentative. Docket No. 43-3 at 2. If true, that would render GM's explanation unworthy of credence. The decision belongs to the jury.

The Court nevertheless continues a moment to explain why summary judgment must nevertheless be denied even if Starling *had* raised his voice. Both parties' arguments on this point are, if taken to their natural conclusion, unpersuasive and inconsistent with existing law.

It cannot be true that an employer can discriminate against or sexually harass an employee and nevertheless be immunized from liability if the employee raises their voice when he or she complains about it. "An emotional response to a racial or religious epithet is a most natural human reaction. It would be ironic, if not absurd, to hold that one loses the protection of an antidiscrimination statute if one gets visibly (or audibly) upset about discriminatory conduct." *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1022 (10th Cir. 2004).

At the same time, it also cannot be true that employees face no consequence if they complain about discrimination in a dangerous or genuinely threatening way. "We have long held that an employee's conduct in opposition to what she sincerely believes are unlawful employment practices may be so disruptive or inappropriate as to fall outside the scope of protected activity." *Kaplan v. City of Arlington*, 48 F. App'x 916, at *1 (5th Cir. 2002) (citation omitted). There has to be some middle ground.

Fifth Circuit precedent acknowledges this truth. It instructs us that in these situations, "[t]he yardstick against which the employee's conduct must be measured is the flexible and protean doctrine of reasonableness in the light of the circumstances." *Douglas v. DynMcDermott Petroleum Operations Co.*, 144 F.3d 364, 374 (5th Cir. 1998) (cleaned up). "This determination of reasonableness is made on a case by case basis by balancing the purpose of

10

the statute and the need to protect individuals asserting their rights thereunder against an employer's legitimate demands for loyalty, cooperation and a generally productive work environment." *Rollins v. State of Fla. Dep't of L. Enf't*, 868 F.2d 397, 401 (11th Cir. 1989) (citation omitted).

Applying this law, and presuming that Starling had raised his voice, the summary-judgment record still reveals a factual dispute about whether Starling's complaints were reasonable under the circumstances. A jury could find that falling victim to repeated racial discrimination at work is something that quite naturally would make someone's voice shake with emotion, passion, or even anger when the discrimination is finally aired and brought to the employer's attention. That is reasonable human behavior. A jury could hear such evidence and accept that being fired for such activity constitutes retaliation.

In any event, because there is a factual dispute about the nature of Starling and Nelson's conversation, which in turn renders GM's reason for termination disputed, summary judgment cannot be granted on Starling's race-retaliation claim.

### C. Race Discrimination

> To establish a *prima facie* claim for race discrimination under Title VII, a plaintiff must show that he (1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group.

*Ernst*, 1 F.4th at 339. The same standard applies to § 1981 claims. *See McLin v. Twenty-First Judicial Dist.*, 79 F.4th 411, 417 (5th Cir. 2023). If the plaintiff makes out a prima facie case, the parties then move on to steps two and three of the burden-shifting framework, which has already been described above. *Ernst*, 1 F.4th at 339.

GM disputes only the last element of the prima facie case: whether Starling was treated less favorably than a similarly-situated employee. It emphasizes that Starling and McNair are not comparable because McNair never yelled or raised his voice at Nelson.[3]

As Starling observes in his response, however, there is a factual dispute about the manner in which Starling made his complaint. "If—as Plaintiff contends—Starling never yelled and his supervisor lied about it, then McNair is a comparator that also never yelled at Nelson," he says. Docket No. 44 at 15. The Court agrees.

GM then disputes step three, pretext. The Court concludes that the evidence discussed above reveals a factual dispute about whether GM's reason for the termination—the "aggressive outburst"—is worthy of credence. Summary judgment must therefore be denied on this claim.

### D.  Age Discrimination

The ADEA makes it "unlawful for an employer to . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

"To demonstrate age discrimination a plaintiff must show that (1) he was discharged; (2) he was qualified for the position; (3) he was within the protected class at the time of discharge; and (4) he was . . . replaced by someone younger." *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 309 (5th Cir. 2004) (cleaned up). If the case turns on circumstantial evidence, the same second and third steps of the *McDonnell Douglas* standard apply. *Id.*

---

[3] GM's reply brief attempted to dispute new elements, but that was too late, as it deprived Starling of an opportunity to respond. The Court will not consider these arguments.

12

Here, GM disputes the fourth element: whether Starling was replaced by a younger person. It argues that Starling's position was filled by Tammy Atkins, a 53-year-old Black woman. Starling responds that he was replaced by Justin Nelson, a recent college graduate under the age of 40.

This Court previously found that as a sanction for withholding relevant evidence, GM may not rely upon or introduce evidence from Tammy Atkins. Docket No. 50. As such, the Court accepts for present purposes that Justin Nelson replaced Starling. It follows that Starling has met his prima facie burden.

GM then lodges its arguments about a lack of pretext. For the reasons discussed above, there is a genuine issue of fact on that element. Summary judgment on this claim is denied.

### IV. Motion *in Limine*

Starling's motion seeks to exclude from trial a variety of evidence. He presents them in 10 enumerated paragraphs. Each category is considered in turn.

As to paragraphs 1 and 2, GM's response brief has provided no authority for the proposition that it may introduce at trial evidence that it never disclosed during discovery. The Court grants the motion to the extent that the parties may seek to introduce only evidence that was produced by either side in discovery.

As to paragraphs 3 and 4, the motion is denied without prejudice as insufficiently specific.

The plaintiff's requests in paragraphs 5, 7, 8, and 10 are denied without prejudice to being re-urged at trial with supporting caselaw.

On paragraph 6, the briefing suggests that the parties agree that documents they produced during the EEOC investigation may have evidentiary value, but not documents showing the EEOC's own investigation or analysis.

The parties agree that paragraph 9 should be granted per Rule 408.

## V.   Conclusion

For these reasons, the pending motions are granted in part and denied in part. The Courtroom Deputy shall add this case to the trial calendar. With these rulings in hand, the parties are encouraged to reignite their settlement discussions.

**SO ORDERED**, this the 3rd day of September, 2024.

s/ Carlton W. Reeves  
UNITED STATES DISTRICT JUDGE